IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>TEI MATI,<br><br>Defendant. | Case No. 19-cr-00479-CRB-1<br><br>**ORDER GRANTING MOTION TO SUPPRESS** |

Defendant Tei Mati moves to suppress evidence seized from his car and storage facility after San Francisco Police Department (SFPD) officers stopped him in the Tenderloin for having an expired registration. See Mot. (dkt. 24). The Court finds this matter suitable for resolution without oral argument and therefore VACATES the motion hearing currently set for Wednesday, June 17, 2020. The central issue in this motion is whether the otherwise lawful traffic stop became unlawful when the officers took time to look into whether Mati was on probation or parole and whether he had a search condition. The Court concludes that it did.

I.  **BACKGROUND**

   A.  **SFPD Officers Stop Mati and Search His Vehicle**

On July 8, 2019, at about 8:40 P.M., SFPD officers Richard Schiff and Christopher Quiocho were patrolling San Francisco's Tenderloin neighborhood. Stern Decl. Ex. A. (dkt. 31-1) (Schiff Decl.) ¶ 5; id. Ex. B (Quiocho Decl.) ¶ 7. Schiff was a field training officer and Quiocho was his trainee. Id. The officers' patrol vehicle was stopped at the intersection of Turk and Mason streets when Schiff observed a dark green GMC Yukon traveling on Mason toward the intersection at a high rate of speed. Schiff Decl. ¶ 6. As the officers made a left turn onto Mason,

1   Schiff saw the Yukon abruptly stop short of the intersection and then turn right onto Turk, away
2   from the officers. Id. ¶ 7–8.[1]  Schiff believed that the Yukon might have stopped short because the
3   driver saw their patrol car. Id. ¶ 8.
4       Because of the Yukon's high rate of speed and abrupt stop, Schiff performed a records
5   check. Id. ¶ 9.  The records check revealed that the Yukon's registration had expired in October of
6   2018. Id. ¶¶ 9–10.  It is SFPD policy to tow any vehicle with a registration that has been expired
7   for more than six months. Id. ¶ 10.  Quiocho turned the patrol car around and returned to the
8   intersection, but the Yukon was no longer in sight. Id. ¶ 11.  The officers proceeded westbound on
9   Turk Street and found the Yukon parked legally on the south side of the street, about one block
10  from the intersection of Turk and Mason. Id. ¶ 12.  Less than three minutes passed from when the
11  officers first saw the Yukon to when they located it parked on Turk. See Stern Decl. Ex. C (Unit
12  History Detail); Linker Decl. Ex. B (dkt. 25-2) (Schiff BWC) at 00:02.  The officers saw that the
13  driver's side door was open and a man, later identified as Mati, was standing next to the open
14  door. See Schiff Decl. ¶ 12; Quiocho Decl. ¶ 8.  Mati shut the door and began to walk away.
15  Schiff Decl. ¶ 12.  There were no passengers in the Yukon or other people near the Yukon. Id.
16  Based on Mati's evasive maneuvers and Schiff's knowledge of the Tenderloin, Schiff suspected
17  that Mati might have been involved in criminal activity. Id. ¶¶ 14–16.
18      Schiff told Mati that he had seen him "coming in hot" down Mason Street and that his
19  registration had been expired since October 2018, to which Mati responded, "It's just a bus lane."
20  Schiff BWC at 00:40; Schiff Decl. ¶ 18.  Mati added that he was making payments on his tickets.
21  Id.  He was holding keys and did not deny being the driver of the Yukon. Schiff BWC at 01:18;
22  Schiff Decl. ¶ 18.  The officers told Mati that they were going to write him a parking ticket
23  because they had not seen him driving. Schiff Decl. ¶ 19; Schiff BWC at 1:40, 1:48.  Schiff
24  directed Mati to give Quiocho his information, and Mati produced a driver's license. Schiff BWC
25  at 00:50; Quiocho Decl. ¶ 9.  Quiocho returned to the patrol car to conduct a records check on
26  Mati on the computer. Quiocho Decl. ¶ 9.  The officers both declare that it is SFPD policy to

---

[1] It turns out that this is the only direction one can turn from Mason—one cannot go straight or turn left. See Reply (dkt. 42) at 9–10; Johnson Decl. Ex. F.

1    conduct a records check for all traffic and investigatory stops. Schiff Decl. ¶ 20; Quiocho Decl. ¶

2    10. Schiff remained with Mati, and again stated that Mati would not be receiving a moving

3    violation because the officers did not see him driving. Schiff BWC at 2:44.

4          Schiff then asked Mati whether he was on probation or parole. Id. at 2:59; Schiff Decl. ¶

5    23. Mati said that he was on probation. Schiff BWC at 3:01–02; Schiff Decl. ¶ 23. Schiff asked

6    Mati what he was on probation for, and Mati said that it was "a weapons charge"—one involving

7    a gun—but that it had already been resolved in Veteran's Court. Schiff BWC at 3:03, 3:10; Schiff

8    Decl. ¶ 23. Schiff asked Mati whether he had a search condition, and Mati replied that he did not.

9    Id. at 3:23–24; Schiff Decl. ¶ 23. Schiff declares that one of the reasons he asks about parole and

10   probation status is for officer safety. Schiff Decl. ¶ 23.

11         At this point, Quiocho declares that he had not yet initiated the records check, and that he

12   momentarily got out of the patrol car to see if Schiff needed assistance. Quiocho Decl. ¶ 11. Mati

13   disputes this, arguing that it is not credible that Quiocho simply sat in the patrol car and did

14   nothing for a minute and a half. See Reply at 3.[2] Mati therefore states: "apparently, having

15   completed the check of Mr. Mati's driver's license without issue, Off. Quiocho exited the patrol

16   vehicle with his driver's license and a pad of parking tickets in hand." Mot. at 2–3 (citing Linker

17   Decl. Ex. C (Quiocho BWC) at 0:05). The video of this moment from Quiocho's body camera is a

18   little difficult to parse, in part because there is no sound for this portion and in part because the

19   video starts just before Quiocho exits the car. Quiocho steps out of the vehicle with Mati's license

20   and a pad of what appear to be parking tickets, then almost immediately gets back into the vehicle.

21   Quiocho BWC at 0:05–0:14. When Quiocho emerges from the patrol car, Schiff yells to Quiocho

22   that Mati might be on probation and asks Quiocho to check whether Mati had a search condition.

23   Quiocho Decl. ¶ 11; Schiff BWC at 3:28–34.

24         Both officers declare that SFPD policy is to conduct a records check for all traffic and

25   investigatory stops, and that they perform such checks as a matter of course. Schiff Decl. ¶ 20;

---

[2] See also Reply at 2 n.2 (explaining that per Schiff's BWC, Quiocho leaves with Mati's driver's license at 2:05, and at 3:27, Schiff tells Quiocho to investigate the search condition).

United States District Court
Northern District of California

1    Quiocho Decl. ¶ 10.³  They assert that the records checks return information on the validity of the

2    driver's license, whether the individual has any wants and warrants, whether he is on probation or

3    parole, and his arrest record, all of which are relevant to officer safety.  Id.  Schiff declares that he

4    asked Quiocho to check on Mati's probation status because Quiocho is in training and Schiff

5    "wanted to ensure that [Quiocho] checked."  Schiff Decl. ¶ 24.  Quiocho declares that Schiff's

6    request did not alter his records check because he checks this information anyway as part of his

7    standard records check.  Quiocho Decl. ¶ 11.

8    Quiocho returned to the patrol car.  Quiocho BWC at 0:12.  At the same time, Schiff had

9    Mati put his hands against the hood of the Yukon and frisked him, asking him if he had any

10   weapons.  Schiff BWC at 3:43–53.⁴  Schiff declares that he did so because he suspected that Mati

11   might have a weapon.  Schiff Decl. ¶ 25.  The frisk revealed nothing.  Id.  Quiocho's records

12   search confirmed that Mati was on probation and was subject to a warrantless search condition.

13   Quiocho Decl. ¶ 12; Stern Decl. Ex. D (CAD Log) (dkt. 31-4) at 1.  Quiocho got out of the patrol

14   car and informed Schiff that Mati had a search condition.  Schiff Decl. ¶ 23; Schiff BWC at 5:15.

15   The length of time between when Quiocho first exited the patrol vehicle with his parking-ticket

16   pad and when he informed Schiff of Mati's search condition was approximately 1 minute and 41

17   seconds.  Schiff BWC at 3:27–5:15; Quiocho BWC at 0:05–1:48.

18   Schiff told Mati that they were going to search the Yukon and asked if there was anything

19   they should know.  Schiff Decl. ¶ 27.  Mati did not respond.  Id.  Schiff asked Mati if he had any

20   weapons in the vehicle.  Id.  Mati responded, "you can check."  Id.; Schiff BWC 5:35; Quiocho

21   BWC at 2:08.  Quiocho asked again about weapons in the Yukon, and Mati responded, "I mean . .

22   . man . . . I just parked . . . you guys said . . . I was outside the car man . . ."  Quiocho Decl. ¶ 13.

23   Mati appeared irritated and started fidgeting, swaying side to side, avoiding eye contact, and

---

³ The government does not attach a copy of any such policy and Mati argues that one does not exist.  Reply at 7.  This is not significant.  The question is whether the inquiry into Mati's parole/probation status and whether he had a search condition unconstitutionally prolonged the stop.  If it did, then it does not matter for purposes of the present motion whether it was SFPD policy to unconstitutionally prolong the stop.
⁴ Mati argues explicitly in his reply brief, but not explicitly in his motion, that this frisk was unlawful.  See Reply at 11.  The Court does not reach this question.

4

turning to look in different directions. Id.; Schiff Decl. ¶ 28. Schiff declares that he was concerned that Mati might be looking for avenues of escape. Schiff Decl. ¶ 28. Mati actually picked up his keys from the hood of his car momentarily, until Quiocho instructed him to put them back on the hood. Quiocho BWC at 2:51. The officers put Mati in handcuffs. Quiocho Decl. ¶ 14; Schiff BWC at 6:44. Quiocho told Mati they were doing so "for my safety and yours." Quiocho BWC at 3:11. Schiff explained to Mati that they were handcuffing him because they were "out here by ourselves . . . you're on probation for a . . . violent crime, right, so for everyone's safety—your safety and ours—we're just putting some cuffs on you." Schiff BWC at 6:59–7:10. The officers declare that they believed that Mati might have a weapon or contraband in his vehicle based on his reaction to being told the car would be searched and his evasive answers about whether there was a weapon in his car. Schiff Decl. ¶ 29; Quiocho Decl. ¶ 13. Two additional officers arrived and supervised Mati while Schiff and Quiocho searched the Yukon. Linker Decl. Ex. A at 4 (Narrative); Schiff BWC at 8:40 (Schiff explaining to Mati that they were going to have Mati sit in the other officers' car during the search because Mati was "getting a little worked up").

The officers conducted a search of the vehicle and found a sawed-off twelve-gage shotgun and ammunition. Schiff Decl. ¶ 32; Quiocho Decl. ¶ 16. The officers placed Mati under arrest and seized the evidence. Schiff Decl. ¶ 33.

### B. Mati Statements Lead to Search of Storage Unit

Back at the Tenderloin Station, Mati waived his Miranda rights and told officers that he had been taking the shotgun to his storage unit on Egbert Street in San Francisco. Id. at 35. He described the gun as a "single-shot" and admitted to sawing it off himself. Id. Mati then recanted his statement about taking the gun to a storage unit. Id. ¶ 36. A week later, Schiff and Quiocho, along with other officers, went to "Self-Storage" on Egbert Street in San Francisco. Linker Ex. A at 17. They made contact with a customer service representative, explained Mati's search conditions, and gained access to Mati's storage unit. Id. The officers searched the storage unit and found, among other things, 70 unfired shotgun cartridges, a cross-bow, rifle scope, and tactical

vest. Id. at 18.

### C.     Mati's Search Condition[5]

On January 20, 2017, Mati pled guilty to Possession of a Firearm by a Prohibited Person. Stern Decl. Ex. E (Transcript of Plea Colloquy) (dkt. 31-5). He was sentenced to a three-year term of probation, which included the following search condition: "Defendant is subject to a warrantless search condition, as to the defendant's person, property, premises and vehicle, any time or the day or night, with or without probable cause, by any peace, parole, or probation officer." Stern Decl. Ex. G (Probation Order) (dkt. 31-7). Mati agreed to the suspicionless search condition at the plea colloquy and later signed an acknowledgment that his probation officer had explained the probation conditions to him. Id.; Stern Decl. Ex. E at 5:3–8, 5:17–18, 5:19. At Mati's change of plea hearing, he also stipulated that the factual basis of his plea was SFPD police report number 150093903. Id. at 8:9–13. That police report states that on January 31, 2015, Mati purchased beer at a liquor store in San Francisco and then became angry about the price of the beer. Stern Ex. F (SFPD Report 15009303) (dkt. 3-6). He left the store but returned holding a pistol-grip shotgun, which he raised toward the cashier counter and then toward the ceiling while yelling at the cashier. Id. at 3, 7.

### D.     Procedural Posture of This Case

Mati was originally charged in California Superior Court with offenses relating to the shotgun, ammunition, and methamphetamine found in this case. See Mot. at 4. On September 24, 2019, a federal grand jury indicted Mati for violations of 18 U.S.C. § 922(g)(1), Felon in Possession of Firearm and Ammunition, and 26 U.S.C. § 5861(c), Possession of a Prohibited Firearm. Indictment (dkt. 9). Mati now moves to suppress the gun found by the officers and the ammunition and evidence found in his storage unit. See Mot.

---

[5] The Court includes this information only because the government includes it in its briefing. The government has not demonstrated that the officers knew all of this information at the time of the stop or search.

6

## II.  LEGAL STANDARD

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. When law enforcement agents obtain a search warrant, generally courts must show deference to the magistrate judge's determination of probable cause. Illinois v. Gates, 462 U.S. 213, 236 (1983). Warrantless searches and seizures, on the other hand, are presumed to be unreasonable unless they fall within "a few specifically established and well-delineated exceptions." United States v. Scott, 705 F.3d 410, 416 (9th Cir. 2012). "The government bears the burden of justifying a warrantless search." United States v. Johnson, 936 F.2d 1082, 1084 (9th Cir. 1991). If the government fails to meet this burden, evidence obtained as a result of the illegal search or seizure usually will not "constitute proof against the victim." Wong Sun v. United States, 371 U.S. 471, 484 (1963); see also United States v. Lundin, 817 F.3d 1151, 1157 (9th Cir. 2016).

## III.  DISCUSSION

Mati argues that: (A) his initial detention was unreasonable; and (B) even if the officers had reasonable suspicion to detain him due to his expired registration, Officer Schiff deviated from the traffic mission of his detention and unlawfully prolonged the stop by asking Mati about his probation/parole status. Mot. at 9, 10. The government disputes these arguments, and argues that: (C) the search was further justified because it was conducted within the scope of a violent felon's search condition, see Opp'n at 12–13, and (D) in any case, the exclusionary rule should not apply, id. at 14–15. The Court addresses each argument below.

### A.  Initial Detention

The Court disagrees with Mati's argument that the initial detention was unreasonable. "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention," like traffic stops, and "requires that the seizure be reasonable." United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). The Fourth Amendment requires traffic stops to be based on reasonable suspicion grounded in "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person

detained is engaging in criminal activity." United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000). "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also be grounded in objective facts and be capable of rational explanation." Id. (internal quotation marks omitted). Parking violations and other traffic violations are sufficient to establish reasonable suspicion. United States v. Choudhry, 461 F.3d 1097, 1098 (9th Cir. 2006); see also United States v. Parker, 919 F. Supp. 2d 1072, 1079 (E.D. Cal. 2013) (reasonable suspicion to briefly detain and question defendant who approached illegally parked vehicle with expired registration).

Here, the officers saw Mati standing in the driver's side door of the Yukon, which had an expired registration, moments after they had seen it driving. There was no one else near the car. He was holding keys. They therefore had reasonable suspicion to stop him.

### B. Prolongation of the Stop

Mati argues next that even if the stop was lawful to begin with, the officers unlawfully prolonged it by asking about Mati's probation status. See Mot. at 9. The Court agrees.

#### 1. Relevant Caselaw

The Supreme Court held in Rodriguez v. United States, 575 U.S. 348, 350 (2015), that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." In that case, the police lawfully stopped a driver for briefly veering onto the shoulder of the road. Id. After writing and then explaining a written warning to the driver, returning the driver's and passenger's documents to them, and reaching the point at which all of the reasons for the stop were, according to the officer, "out of the way," the officer instructed the driver to turn the car off and conducted a dog sniff. Id. at 351–52. The Court held that the dog sniff—although it only added 7 to 10 minutes to the stop—unreasonably prolonged the stop because it "'prolonged [the seizure] beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." Id. (quoting Illinois v. Caballes, 543 U.S. 405, 407 (2005)).

The Court explained that the mission of the stop was "to address the traffic violation that

warranted the stop . . . and attend to related safety concerns." Id. at 354. The mission of the stop entails not only determining whether to issue a traffic ticket, but also "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id. at 355. These other tasks "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." Id. Law enforcement officers' "[a]uthority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Id. at 354. While an officer may "conduct certain unrelated checks during an otherwise lawful traffic stop," "he may not do so in a way that prolongs the stop, absent" reasonable suspicion. Id. at 355. Unlike checking for outstanding warrants, a dog sniff "is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" Id. at 355–56 (quoting Indianapolis v. Edmond, 531 U.S. 32, 40–41 (2000)). "On-scene investigation into other crimes . . . detours from" the mission of the stop. Id. at 356. Accordingly, so long as the unrelated inquiry "prolongs" or "adds time to" the stop, beyond "the amount of 'time reasonably required to complete [the stop's] mission,'" that stop is "unlawful." Id. at 357 (quoting Caballes, 543 U.S. at 407).

    The Ninth Circuit applied Rodriguez to a traffic stop in United States v. Evans, 786 F.3d 779 (2015). The officers in that case pulled a car over for an unsafe lane change and for following a vehicle too closely. Evans, 786 F.3d at 782. The officer "performed vehicle records and warrants checks, tasks that are 'ordinary inquiries incident to the traffic stop,'" and then "[a]fter completing those record checks, [the officer] requested an additional one—an ex-felon registration check" to check the driver's criminal history and whether he was registered at the address he had provided to the officer. Id. at 786. The officer also conducted a dog sniff. Id. at 784. Citing Rodriguez, the Ninth Circuit held that "[t]he ex-felon registration check, unlike the vehicle records or warrants check, was wholly unrelated to [the officer's] 'mission' of 'ensuring that vehicles on the road are operated safely and responsibly.'" Id. at 786 (citing Rodriguez). It was instead "a measure aimed 'detect[ing] evidence of ordinary criminal wrongdoing.'" Id. Because the ex-felon registration check and the dog sniff were "unrelated to the traffic violation for which [the officer] stopped Evans," both "prolonged [the traffic stop] beyond the time reasonably required to

9

1  complete [the] traffic mission, and so violated the Fourth Amendment, unless there was an
2  independent reasonable suspicion justifying each prolongation." Id. (internal quotation marks
3  omitted).

4  The Circuit added that it did not matter that the ex-felon registration check "'occur[ed]
5  before . . . the officer issue[d] a ticket'" because the "'critical question' is whether the check
6  'prolongs —i.e., adds time to—the stop.'" Id. (quoting Rodriguez, 575 U.S. at 357). The court
7  explained, further, that while an officer may take "'certain negligibly burdensome precautions in
8  order to complete his mission safely,'" the time it took to conduct the ex-felon registration check
9  was not negligible, and in fact, "the ex-felon registration check in no way advanced officer
10 safety." Id. at 787 (quoting Rodriguez, 575 U.S. at 356) (adding that "[t]he check . . . was
11 inversely related to officer safety; that is, [the officer] would have been safer had he let Evans go
12 once he determined that there was no reason to cite him."); see also id. (citing Rodriguez, 575 U.S.
13 at 356 ("safety precautions taken in order to facilitate" investigation of other crimes are not related
14 to traffic mission)).

15 In United States v. Landeros, 913 F.3d 862, 866 (2019), the Ninth Circuit reiterated that
16 the chronology of events did not matter, holding that in Rodriguez, "[w]hat mattered was the
17 added time, not at what point, in the chronology of the stop, that time was added." And it
18 explicitly rejected the notion that officers can extend a stop so long as the circumstances are
19 "reasonable," holding that under Rodriguez, "a traffic stop may be extended to conduct an
20 investigation into matters other than the original traffic violation only if the officers have
21 reasonable suspicion of an independent offense." Id. at 867; see also id. (independent, reasonable
22 suspicion required if additional investigation "adds any time to a traffic stop") (internal quotation
23 marks omitted). The Ninth Circuit repeated the point it made in Evans that prolonging "the stop,
24 and thereby prolonging the officers' exposure to Landeros, was, if anything, 'inversely related to
25 officer safety.'" Id. at 868 (quoting Evans, 786 F.3d at 787).

26 While the Ninth Circuit has not decided whether asking a driver if he is on probation or
27 parole is—like checking a driver's license—merely part of the traffic mission, other judges in this
28 district have. In United States v. Ward, No. 16-cr-485-JST, 2017 WL 1549474, at *1 (N.D. Cal.

10

May 1, 2017), officers observed a parked car with expired registration tabs. They asked the driver for his name and identification, and ran the name he gave them to see if it corresponded with who was in the car. "Either before or after running Ward's name . . . Officer Meads 'made small talk with Ward,'" which he described as follows:

> I asked Ward if he was on probation or parole. Ward told me that he was not, but that he used to be on parole. Ward went on to say that he hasn't been in trouble for several years and was doing well. I asked Ward if he had anything illegal in his possession to which he replied, "No." I then said, "Can I search you and your car to make sure?" Ward said, "Sure, if you want to."

Id. The officer ultimately found a loaded firearm in Ward's pocket. Id. Judge Tigar held that the officers' "inquiries are not 'fairly characterized as part of the officer's traffic mission.'" Id. at *3 (quoting Rodriguez). Instead, Judge Tigar concluded that the probation/parole question was aimed at detecting evidence of a crime; it was "wholly unrelated to [the officers'] mission of 'ensuring that the vehicles on the road are operated safely and responsibly.'" Id. (citing Evans, 786 F.3d at 786). Judge Tigar rejected the officer's characterization of what occurred as "small talk": "[a]sking about parole or probation status or inquiring whether a person has anything illegal in his vehicle are attempts by law enforcement to uncover criminal activity, not casual conversation." Id. Nor was Judge Tigar persuaded by the government's argument that the officer's questions only lasted for a few minutes; what mattered was that the questions and searches "measurably extended the duration of Ward's traffic stop." Id. Judge Cousins also held, in Amanuel v. Soares, No. 13-cv-5258-NC, 2015 WL 3523173, at *7 (N.D. Cal. June 3, 2015), that questions about whether a driver was on probation or parole and about a prior arrest were "akin to the ex-felon check in Evans and . . . not reasonably related to the traffic infraction." But see Adamson v. City of San Francisco, No. 13-CV-05233-DMR, 2015 WL 5467744, at *4 (N.D. Cal. Sept. 17, 2015) (holding that defendant failed to demonstrate that probation/parole question was improper or unreasonably prolonged the stop, but noting that defendant "did not argue that the length of the traffic stop was excessive.").

### 2. Application to This Case

#### a. The Mission of the Traffic Stop

11

This Court agrees with Judge Tigar and Judge Cousins that asking a driver about his probation status—and particularly whether he has a search condition—is not aimed at ensuring that vehicles on the road are operated safely and responsibly. Asking whether a driver is on probation and has a search condition is, instead, intended to uncover evidence of criminal activity. Several California jurisdictions have apparently reached the same conclusion, prohibiting law enforcement from asking such questions. See Mot. at 11 (citing examples from the Oakland Police Department and San Diego Police Department).

The government argues, though, that "the probation inquiries were within the scope of the stop because they supported the officer's mission in completing the stop safely," see Opp'n at 8. Certainly a stop's mission includes not only addressing the traffic violation but also "attend[ing] to related safety concerns." See Rodriguez, 575 US. at 354. Judge Tigar understood this in adjudicating Ward, notwithstanding the government's attempt to distinguish that case here. See Opp'n at 9–10. A supplemental brief filed by the government in Ward, and cited by the court, see Ward, 2017 WL 1549474, at *3, addressed officer safety concerns, see United States v. Ward, Case No. CR-16-00485 JST, Dkt. 20 at 4:16–18 ("In fact, Rodriguez specifically acknowledged that officer safety concerns justify typical undertakings such as checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."). Ward held unambiguously that probation/parole inquiries were not related "to the mission of the traffic stop," Ward, 2017 WL 1549474, at *3, which by definition includes "attend[ing] to related safety concerns," see Rodriguez, 575 U.S. at 354.[6]

While Schiff stated that one of the reasons he asks about parole/probation status is for officer safety, Schiff Decl. ¶ 23, the Court observes that there are lots of intrusions that might make officers safer—like strip-searching everyone the police come into contact with—but that

---

[6] The government's additional argument that Ward and Amanuel are distinguishable because the unrelated questioning in those cases did not occur "early in the traffic stop, when such inquiries were relevant to officer safety," see Opp'n at 10 n.7, ignores the Ninth Circuit's holding that "[w]hat matter[s is] the added time, not at what point, in the chronology of the stop, that time was added." See Landeros, 913 F.3d at 866.

12

might nonetheless run afoul of the Fourth Amendment.  Nor is an intrusion that theoretically serves a safety interest permissible if it is actually a means of investigation.  Indeed, Schiff essentially acknowledged having an investigatory motive in this case.  He states on the body camera footage that he routinely asks about probation as early as possible during a traffic stop, see Schiff BWC at 54:0–54:21, as one of the "little things" that lead to the discovery of other crimes, see id. at 18:20–18:46 ("just do the little things.  It really is just do the little—was telling [Quiocho] right before this, ya' know.  Do the little things.  Where you run plates.  Check people.  Got expired plates?  Stop.  Talk to 'em.  10-35?[7]  He's in possession. . . ."); Quiocho BWC at 22:21–22:24 (Schiff motioning inside the Yukon, stating, "What did I tell you, man?  You do the little things.  The little things are how you get stuff like this, right?"); see also Schiff Decl. ¶ 17 ("We stopped Mati to investigate the expired registration, determine whether to tow his vehicle, and in order to investigate whether he was engaged in other criminal activity.") (emphasis added).  Rodriguez cautioned against just this: "safety precautions taken in order to facilitate" on-scene investigations into other crimes.  575 U.S. at 356.

       In addition, the Ninth Circuit has twice observed that spending more time with a driver to ask him unnecessary questions actually has an inverse relationship to safety.  See Evans, 786 F.3d at 787; Landeros, 913 F.3d at 868.  It likely would have been safer for the officers to send Mati on his way with a parking ticket for his expired registration, as they told him repeatedly they would do, see Schiff Decl. ¶ 19; Schiff BWC at 1:40, 1:48 (officers told Mati that they were going to write him a parking ticket because they had not seen him driving); Schiff BWC at 2:44 (Schiff again informed Mati that he would not be receiving a moving violation because the officers did not see him driving), and seem to have planned to do, see Quiocho BWC at 0:05–0:14 (Quiocho steps out of the vehicle with Mati's license and a pad of what appear to be parking tickets), than to extend the encounter by inquiring into his criminal history, probation status, and search condition.  As Mati points out, "neither officer's declaration claims Mr. Mati acted nervously before they

---

[7] Mati asserts that "10-35" is SDPD code for someone with a search condition.  See Reply at 5 n.6 (citing Linker Decl. Ex. D (SFPD Radio Codes identifying 10-35 as "Person must consent to search")).

unlawfully extended the stop to investigate a probation search condition." See Schiff Decl. ¶¶ 1–28; Quiocho Decl. ¶¶ 1–13.

The Court therefore concludes that asking about Mati's probation status and search condition was outside the mission of the traffic stop, even taking into account officer safety concerns.

### b. Adding "Any Time" to the Stop

The next question is whether Schiff's asking Mati about his probation status and search condition, and Quiocho's returning to the patrol car to investigate both, added time to the stop. See Rodriguez, 575 U.S. at 355 (an officer can "conduct certain unrelated checks during an otherwise lawful traffic stop" but "he may not do so in a way that prolongs the stop, absent" reasonable suspicion). Of course it did—and it does not matter that the time added was relatively short. See Opp'n at 10–12 (government arguing that Quiocho was at the patrol car for "no more than three minutes" and reviewing computer data for "less than thirty seconds," both of which were "well shorter than the 'several minutes'" at issue in Landeros and Evans.). Rodriguez rejected the government's argument that "by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue an unrelated criminal investigation," and instead held that "[i]f an officer can complete the traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission.'" 575 U.S. at 357; see also Landeros, 913 F.3d at 867 (rejecting reasonableness inquiry, holding that traffic stop is unlawfully prolonged where "any time" is "added."); United States v. Campbell, 912 F.3d 1340, 1355 (11th Cir.), cert. denied, 140 S. Ct. 196 (2019) (questions "not related to a traffic stop for a malfunctioning turn signal and allegedly crossing the fog line" but instead aimed at "inquiring about 'crime in general [and] drug trafficking in particular,'" which added 25 seconds to the stop, unconstitutionally prolonged the stop), id. at 1354 (collecting cases); United States v. Clark, 902 F.3d 404, 410–11 (3d Cir. 2018) (same for 20-second prolongation; "there is no de minimis exception to this rule").

It appears from the body camera footage that Quiocho had completed whatever he was going to do in the patrol car, and was returning with a pad of parking tickets, when Schiff asked him to investigate whether Mati had a search condition. Quiocho BWC at 0:05–0:14. Nothing on

14

Schiff's body camera footage suggests that Schiff needed Quiocho's assistance at that moment. The parties dispute, though, whether Quiocho had already conducted a records check of Mati's license during the minute and a half when he was sitting in the patrol car before that, or whether he was going to have to return to the patrol car to do the records check regardless of Schiff's instruction. Compare Quiocho Decl. ¶ 11 (Quiocho declares that he had not yet initiated the records check); and Opp'n at 11 ("Quiocho only performed one records check, after Schiff asked him to check whether Mati had a search condition."); with Reply at 3 (not credible that Quiocho simply sat in the patrol car and did nothing for a minute and a half or that Quiocho exited car to see if Schiff needed assistance); and id. ("Tellingly, Quiocho's declaration says nothing about what else he supposedly did for 1.5 minutes in the patrol car with Mr. Mati's license. See Quiocho Decl. ¶ 11.3."). The Court need not resolve the factual dispute, though, because the officers prolonged the search either way.

If Quiocho had already done a records check on Mati's driver's license, decided to give Mati a parking ticket, exited the patrol car with a pad of parking tickets, and only then, at Schiff's instruction, returned to the patrol car to check for a search condition, see Schiff BWC at 3:28–34, then returning to the patrol car to check for a search condition added time to the detention. See Landeros, 913 F.3d at 866 ("[w]hat mattered was the added time, not at what point, in the chronology of the stop, that time was added."); id. at 867 (independent, reasonable suspicion required if additional investigation "adds any time to a traffic stop").

If Quiocho had not done any records check during his minute and a half in the patrol car, and just sat there while Schiff engaged in the kind of "small talk" that took place in Ward, then Schiff's questions and Quiocho's inaction still prolonged the detention. See Reply at 4. Rodriguez held that "an officer always has to be reasonably diligent." 575 U.S. at 357. And it explained that "[i]f an officer can complete traffic-based inquiries expeditiously, then that is the amount of 'time reasonably required to complete [the stop's] mission,'" and "a traffic stop 'prolonged beyond' that point is 'unlawful.'" Id. (quoting Caballes, 543 U.S. at 407). If Quiocho sat in his patrol car and did nothing for a minute and a half, while Schiff took advantage of the delay to try to detect "evidence of ordinary criminal wrongdoing," then the officers were not

15

reasonably diligent. See Reply at 4.[8]

The Court therefore concludes that the officers' probation and search condition inquiry was outside the mission of a traffic stop for an expired registration, and that such inquiry added time to the detention.

### c. Independent Reasonable Suspicion

The officers' extension of Mati's stop was therefore unconstitutional unless it was supported by independent reasonable suspicion. See Landeros, 913 F.3d at 868. "Reasonable suspicion 'exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion.'" Id. (quoting United States v. Montero-Camargo, 208 F.3d 1122, 1129 (9th Cir. 2000) (en banc). The government argues that the officers had reasonable suspicion that there was contraband in the Yukon. See Opp'n at 12–13. But the basis for this assertion is that "[t]hey had seen the Yukon driving at a high rate of speed in a high crime neighborhood, abruptly stop upon seeing the officers, turn evasively, and park nearby, before Mati attempted to walk away from the Yukon when they found it parked." See Opp'n at 7. The Court is not persuaded.

Mati seems to have driven at a high rate of speed. Schiff Decl. ¶ 6. But despite the government's characterization of his actions as "evasive," and an "attempt to evade officers," see Opp'n at 3, 9 n.5, Mati's driving otherwise consisted of a lawful stop at an intersection and a lawful right-hand turn. That he parked his car is no more suspicious than continuing to drive his car. See Gonzalez-Rivera v. INS, 22 F.3d 1441, 1446–47 (9th Cir. 1994) (noting that "where a factor and its opposite can both be used to justify a stop, the court should not give weight to either factor"). Moreover, he parked legally. See Schiff BWC at 2:44 (Schiff tells Mati that the Yukon was "legally parked"). Schiff asserts that Mati attempted to leave the Yukon when he saw officers approaching, see Schiff Decl. ¶ 16; see also Opp'n at 10 (arguing reasonable suspicion based in

---

[8] That the records check Quiocho ran (and apparently always runs, see Quiocho Decl. ¶ 11), included a check of Mati's probation status and search condition might also mean that the records check itself took longer than it would have had it been limited to only information pertinent to the traffic mission, but the Court cannot so hold without having heard more evidence about how the records check works.

16

part on Mati's "attempt to distance himself from the Yukon"), but the defense rightly argues that "[t]he act of walking away from one's recently-parked vehicle (snacking from a bag of peanut M&Ms, as Mr. Mati was) is decidedly ordinary and devoid of suspicion."  Reply at 10 (citing Schiff BWC at 0:38–40); Moreno v. Baca, 431 F.3d 633, 643 (9th Cir. 2005) (quoting United States v. Valentine, 232 F.3d 350, 357 (3d Cir. 2000) ("'Walking away from the police hardly amounts to . . . headlong flight . . . and of course would not give rise to reasonable suspicion by itself, even in a high-crime area.'")).  To the extent that the government argues that Mati's nervousness is a basis for reasonable suspicion, see Opp'n at 1 (listing "nervous and evasive responses to questions posed" among reasons officers suspected Mati might have contraband in his vehicle), neither the body camera footage nor the officers' declarations reflect that Mati acted nervously until the officers extended the stop to investigate a probation search condition.  See Schiff Decl. ¶¶ 1–28, Quiocho Decl. ¶¶ 1–13.  In any case, nervousness is a weak basis for reasonable suspicion.  See Moreno, 431 F.3d at 642 (nervousness in a high crime area did not create a reasonable suspicion); United States v. Chavez-Valenzuela, 268 F.3d 719, 726 (9th Cir. 2001) ("[e]ncounters with police officers are necessarily stressful for law-abiders and criminals alike.  We therefore hold today that nervousness during a traffic stop . . in the absence of other particularized, objective factors, does not support a reasonable suspicion of criminal activity"), overruled on other grounds by Muehler v. Mena, 544 U.S. 93 (2005).

The government's case for reasonable suspicion therefore amounts to Mati's speeding in a high-crime area.  These are not "specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for particularized suspicion" that Mati had contraband in his car.  See Landeros, 913 F.3d at 868 (internal quotation marks omitted).  Accordingly, the Court holds that the officers' extension of the stop to check whether Mati was on probation and had a search condition was unconstitutional.

### C. Violent Felon Search Condition

The government argues that the search of the Yukon was nonetheless valid because it was conducted within the scope of a violent felon's search condition.  See Opp'n at 12–13 (citing

17

United States v. King, 736 F.3d 805, 810 (9th Cir. 2013)). Because the Court concludes that the officers unlawfully prolonged the stop to investigate whether Mati had a search condition, their discovery of that condition and the search were tainted by illegality. See United States v. Gorman, 859 F.3d 706, 716 (9th Cir. 2017). But even if the officers had not unlawfully prolonged the stop, King stands for the proposition that "a suspicionless search, conducted pursuant to a suspicionless-search condition of a violent felon's[9] probation agreement, does not violate the Fourth Amendment." King, 736 F.3d at 810. King does not justify a search if the officers did not have advance knowledge of the search condition. A warrantless search will only be excused under a search condition if the searching officer knew that it "applied before they conducted the search." United States v. Caseres, 533 F.3d 1064, 1075–76 (9th Cir. 2008). The government failed to demonstrate that the officers actually knew of the scope of Mati's search condition before they conducted the search. See id.[10]

### D.    The Exclusionary Rule

Finally, the government argues that even if there is a Fourth Amendment infirmity, the Court should not apply the exclusionary rule. See Opp'n at 14–15. Police conduct triggers the exclusionary rule only when it is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." United States v. Herring, 555 U.S. 135, 144 (2009). The government argues that the officers here "acted reasonably at every turn." See Opp'n at 15. That is not the Court's view. The officers did not act reasonably by prolonging the traffic stop to check whether Mati was on probation and had a search condition when they had pulled him over for a mere expired registration. Moreover, as

---

[9] Mati argues that he was not on probation for a violent felony. Reply at 16–18. The Court does not reach this point.

[10] The Court also rejects out of hand the government's arguments that the search was reasonable under the totality of the circumstances, see Opp'n at 13 n.11, or that Mati consented to the search of his car, see id. n.10. As to the totality of the circumstances, the officers here were investigating an expired registration citation: the circumstances did not warrant a suspicionless search of his car. As to consent, the officers did not actually ask Mati for consent—they told him that they were going to search, and asked if there were any weapons in the car. Schiff Decl. ¶ 27. Even if Mati had consented, and done so voluntarily, such consent was tainted by the unlawfully prolonged detention.

Judge Tigar held in Ward, "Herring's good faith exception only applies when the officer relies on someone or something else when taking the challenged action." Ward, 2017 WL 1549474, at *4 (quoting United States v. Camou, 773 F.3d 932, 944–45 (9th Cir. 2014) ("The Supreme Court has never applied the good faith exception to excuse an officer who was negligent himself, and whose negligence directly led to the violation of the defendant's constitutional rights.")). The officers here did not rely on someone or something else.

The government also asserts that the attenuation doctrine applies. Opp'n at 15 (quoting Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)). It does not. The discovery of Mati's probation search condition was simultaneous with the officers' improper prolongation of the stop, and it was not an intervening event—it was the very object of the prolonged stop.

## IV.  CONCLUSION

The officers' extension of the stop to inquire into Mati's probation status, and specifically whether Mati had a search condition, was unconstitutional. The officers' searches of the Yukon and the storage facility are therefore fruit of the poisonous tree. See United States v. Washington, 490 F.3d 765, 775 (9th Cir. 2007) (quoting Wong Sun, 371 U.S. at 488) ("evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible . . . unless the evidence obtained was 'purged of the primary taint.'"). Accordingly, the motion is GRANTED.

**IT IS SO ORDERED.**

Dated: June 12, 2020

CHARLES R. BREYER
United States District Judge